UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **TAMMIE WHITE** | * | **CIVIL ACTION** |
| | * | |
| **VERSUS** | * | **NO. 11-1161** |
| | * | |
| **FLORIDA MARINE TRANSPORTERS, INC.** | * | **SECTION "L"(5)** |

## ORDER & REASONS

Before the Court is defendant, Florida Marine Transportation, Inc.'s ("FMT") Motion for Partial Summary Judgment (R. Doc. 17). The Court has reviewed and received briefing from the parties, as well as heard oral arguments. It is now ready to rule. For the following reasons, IT IS ORDERED that FMT's Motion for Partial Summary Judgment is DENIED.

## I. BACKGROUND

This case arises out of alleged personal injuries sustained while working aboard a vessel. Plaintiff, Tammie White, was Captain of the 90' pusher towboat, M/V BILL SEYMOUR, owned and operated by FMT at the time of the alleged incident. Specifically, on or about January 24, 2011, Plaintiff was working aboard the M/V BILL SEYMOUR during the loading and transporting of vacuum gas oil ("VGO") upon the bulk liquid barges M401 and M403 at the Exxon Chalmette refinery. Plaintiff claims that during this time, he was exposed to H2S gas, a highly toxic gas listed as a dangerous substance at 29 C.F.R. 1910.1000. Plaintiff alleges he first smelled a sulfur smell, indicative of this gas, and then "quickly became nauseated, dizzy, with headaches and eye pain and collapsed." (R. Doc. 1). According to Plaintiff, Exxon Chalmette has a history of exposing workers to H2S gas. *Id.* He also claims that treating physicians have diagnosed him as suffering from H2S exposure. *Id.* As a result of

this exposure to H2S gas, Plaintiff claims he continues to suffer from headaches, blurred vision, dizziness, ringing of the ears, and total deafness in his right ear, the latter of which causes him to lose his balance. *Id.* These conditions, according to Plaintiff, will prevent him from renewing his master's license next year. *Id.*

On May 17, 2011, Plaintiff filed suit against FMT in this Court alleging jurisdiction pursuant to the Jones Act, general maritime law, and Federal Rule of Civil Procedure 9(h). (R. Doc. 1). Plaintiff also seeks maintenance and cure from FMT. *Id.* Plaintiff alleges FMT's negligence and the vessel's unseaworthiness as the causes of his injuries, particularly: failure to have appropriate detection and monitoring equipment and alarms on the vessel to detect the H2S gas, failure to provide accessible respirators on the vessel, failure to provide instructions and procedures for using such respirators, and failure to train in how to detect and protect from the gas. *Id.* Plaintiff seeks damages for his personal injuries, loss of income, mental anguish and anxiety, and other losses, including compensatory damages, past and future. *Id.*

On June 7, 2011, FMT filed a Answer, denying liability for Plaintiff's injuries and raising a number of affirmative defenses. (R. Doc. 5).

II.     **PRESENT MOTION**

    A.     **FMT's Motion**

FMT filed the present Motion seeking partial summary judgment dismissing Plaintiff's claims for Jones Act negligence and unseaworthiness. FMT claims that Plaintiff cannot prove that he was exposed to H2S as required by law to survive summary judgment. FMT cites in support, deposition testimony from Plaintiff's crew members who were present at the time of his alleged exposure and readings from gas monitoring devices at the site.

### B.      Plaintiff's Response

Plaintiff filed a Response in opposition to FMT's Motion. (R. Doc. 20). Plaintiff claims that FMT, prior to his incident, recognized H2S as a potentially lethal danger in loading of VGO aboard the BILL SEYMOUR's tow. He further claims that Exxon ordered FMT to obtain H2S personal protective equipment prior to FMT loading the VGO, yet FMT failed to have any self-contained breathing apparatus (SCBA) on board the vessel. Additionally, Plaintiff claims that FMT's tankermen are not H2S certified, in violation of FMT's own requirements. According to Plaintiff, FMT's efforts to detect H2S were less than useless or never undertaken, as evidenced by the following: FMT's tankerman Starcher's recollection of Plaintiff's incident was not accurate or credible; FMT violated its own H2S detection rules; FMT did not provide required electronic H2S detectors for the vessel; and FMT failed to provide its own required impregnated H2S tape detection. Further, Plaintiff claims it is "almost certain" that his H2S exposure was from H2S tainted vapors blowing from vent stacks on the two barges in the BILL SEYMOUR's tow and notes that FMT's shore tankerman did not measure the H2S content of these vapors. Finally, Plaintiff claims he immediately and for days thereafter exhibited classic signs of H2S exposure, which has been confirmed by his treating physicians.

### C.      FMT's Reply

FMT filed a Reply in further support of its Motion. (R. Doc. 26). FMT first notes the uncontested facts and claims these provide further support to his argument that Plaintiff's Jones Act and unseaworthiness claims should be dismissed. Next, FMT argues that Plaintiff has failed to provide evidence of his exposure to H2S. FMT also criticizes Plaintiff's memorandum as "riddled with irrelevant facts, misleading arguments and unsupported theories." Specifically,

FMT argues the following: (1) Plaintiff incorrectly asserts that the VGO onboard the tow had potentially lethal levels of H2S; (2) Plaintiff's argument regarding the fresh air system is flawed because it indicates that the system was in place before loading; (3) the H2S certifications of the FMT tankermen are irrelevant because Plaintiff never came on the barges nor was involved with loading; (4) Plaintiff falsely alleges that FMT failed to make efforts to detect H2S; (5) Plaintiff's own theory of his H2S exposure fails because it is highly speculative and lacks evidentiary support; and (6) Plaintiff's signs of exposure are merely generic illness complaints, lacking medical support.

    **D.**  **FMT's Supplemental Memorandum**

FMT also filed a Supplemental Memorandum in further support of its Motion. (R. Doc. 30). It argues there exists no evidence that Exxon demanded FMT obtain fresh air before loading could start, and even if there was, it is inconsequential since it is uncontested that the VGO in the barges had undetectable amounts of H2S and the cargo did not pose a threat for releasing dangerous amounts of H2S. Second, FMT argues that simply because it had shore tankermen on staff during loading, it does not follow that there exists high concentrations of H2S.

    **E.**  **Plaintiff's Supplemental Memorandum**

Plaintiff filed a Supplemental Memorandum, also, in further opposition to FMT's Motion. (R. Doc. 34). Relying heavily upon the Fifth Circuit's decision in *Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661 (5th Cir. 1999), Plaintiff argues that proof of his H2S exposure warrants denial of FMT's Motion. Specifically, Plaintiff argues that the evidence demonstrates: (1) his symptoms are regarded as indicators of exposure; (2) FMT's work practices make

exposure likely; (3) there is a temporal and scientific connections between Plaintiff's exposure and illness; and (4) circumstantial evidence from FMT's own depositions further support denial of the Motion.

### F. Plaintiff's Expert Reports

Plaintiff filed two motions, seeking to submit certain expert reports as evidence in opposition to FMT's Motion.  *See* (R. Docs. 38, 44).  The Court granted these motions, *see* (R. Docs. 40, 56), permitting Plaintiff to add as supplemental exhibits, the expert reports of Dr. Shelly N. Savant, an adult psychiatrist and neurologist; Dr. Cornelius E. Gorman, II, certified rehabilitation counselor and certified life care planner; David E. Cole, consultant in admiralty and maritime matters; Hector V. Pazos, P.E., naval architect and marine engineer, registered mechanical engineer, and marine consultant; and Patricia M. Williams, Ph.D DABT.

### G. FMT's Second Supplemental Memorandum

FMT filed a Second Supplemental Memorandum.  (R. Doc. 60).  It reiterates its arguments that the undisputed facts mandate dismissal because there is no evidence Plaintiff was exposed to H2S gas.  It then cites new deposition testimony from Plaintiff's physician, Dr. Robert Causey, and the Chalmette Refinery representative, Steven Goulet, as further support of its Motion.  With regard to Dr. Causey, FMT notes his testimony that Plaintiff's symptoms were most likely caused by viral labyrinthitis, not exposure to H2S.  With regard to Mr. Goulet, FMT notes his testimony that fresh air is routinely ordered as a precaution, not as evidence of high H2S levels, and the H2S levels were monitored and safe.  FMT objects to the admissibility of the expert reports of Hector Pazos, David Cole, Neil Gorman, and Shelly Savant, on the basis of relevance and hearsay.  Finally, FMT argues that the expert report of Patricia Williams is

unreliable.

**III.     LAW & ANALYSIS**

    **A.     Standard of Review**

Summary judgment will be granted only if the pleadings, depositions, answers to interrogatories, and admissions, together with affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Brown v. City of Houston*, 337 F.3d 539, 540-41 (5th Cir. 2003). A material fact is a fact which, under applicable law, may alter the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Ameristar Jet Charter, Inc. v. Signal Composites, Inc.*, 271 F.3d 624, 626 (5th Cir. 2001). A dispute is genuine when a reasonable finder of fact could resolve the issue in favor of either party, based on the evidence before it. *Anderson*, 477 U.S. at 250; *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002). "The moving party bears the burden of demonstrating that there exists no genuine issues of material fact." *In re Vioxx Prods. Liab. Litig.*, 501 F.Supp.2d 776, 781 (E.D. La. 2007). When considering a motion for summary judgment, the Court must "review the facts drawing all inferences most favorable to the party opposing the motion." *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 137 (5th Cir. 2004). If the party moving for summary judgment demonstrates the absence of a genuine issue of material fact "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Willis v. Roche Biomedical Labs., Inc.*, 61 F.3d 313, 315 (5th Cir. 1995).

Furthermore, the mere argued existence of a factual dispute does not defeat an

otherwise properly supported motion.  *See Anderson*, 477 U.S. at 248.  Therefore, "[i]f the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate.  *Id.* at 249-50 (citations omitted).  Summary judgment is also proper if the party opposing the motion fails to establish an essential element of his case on which they bear the burden of proof.  *Patrick v. Ridge*, 394 F.3d 311, 315 (5th Cir. 2004).  A non-movant's conclusory allegations or bare assertions unsupported by facts are insufficient to defeat a motion for summary judgment.  *Anderson*, 477 U.S. at 247-48.

### B.  Jones Act Negligence & Unseaworthiness

At issue in the present Motion are Plaintiff's claims pursuant to the Jones Act and the doctrine of unseaworthiness.

Under the Jones Act, an employer has the duty to "provide his seaman employees with a reasonably safe place to work."  *Simmons v. Transocean Offshore Deepwater Drilling, Inc.*, 551 F. Supp. 2d 471, 475 (E.D. La. 2008) (citing *Colburn v. Bunge Towing, Inc.*, 883 F.2d 372, 374 (5th Cir. 1989)).  An employer breaches that duty if it fails to exercise ordinary prudence and is thereby negligent.  *Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331, 338, 339 (5th Cir. 1997) (en banc).  In other words, an employer breaches its duty if it disregards a danger that it "'knew or should have known.'"  *Colburn*, 883 F.2d at 374 (quoting *Turner v. Inland Tugs Co.*, 689 F. Supp. 612, 619 (E.D. La. 1988)).  "The standard of care for a Jones Act seaman is to act as an ordinarily prudent seaman would act in like circumstances."  *Jackson v. OMI Corp.*, 245 F.3d 525, 528 (5th Cir. 2001).  Apart from negligence, a plaintiff seeking relief under the Jones Act must show causation.  "A seaman is entitled to recovery under the Jones Act if his employer's negligence is the cause, in whole or in part, of his injury."  *Gautreaux*, 107 F.3d at

335. The Fifth Circuit has observed that this is a "liberal causation requirement," *Brister*, 946 F.2d at 354, one that places a "featherweight" burden on the plaintiff, *Landry v. Two R. Drilling Co.*, 511 F.2d 138, 142 (5th Cir. 1975) (quotation omitted).

"To establish a claim of unseaworthiness, 'the injured seaman must prove that the [vessel] owner has failed to provide a vessel . . . which is reasonably fit and safe for the purposes for which it is to be used.'" *Boudreaux v. United States*, 280 F.3d 461, 468 (5th Cir. 2002) (quoting *Jackson v. OMI Corp.*, 245 F.3d 525, 527 (5th Cir. 2001)). "A vessel's condition of unseaworthiness might arise from any number of circumstances." *Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 499 (1971). For instance, in addition to the physical condition of the vessel, the vessel may have an unfit crew. *Id.*; *accord Bonmarito v. Penrod Drilling Corp.*, 929 F.2d 186, 189-191 (5th Cir. 1991). A vessel may also be unseaworthy because of "an unsafe method of work." *Johnson v. Offshore Express, Inc.*, 845 F.2d 1347, 1354-55 (5th Cir. 1988); *accord Phillips v. W. Co. of N. Am.*, 953 F.2d 923, 928 (5th Cir. 1992) (noting that "an unsafe method of work may also render a vessel unseaworthy"). "In addition, the plaintiff must establish a causal connection between his injury and the breach of duty that rendered the vessel unseaworthy." *Jackson v. OMI Corp.*, 245 F.3d 525, 527 (5th Cir. 2001).

      **C.**      **H2S Exposure**

The crux of FMT's Motion is whether Plaintiff has demonstrated genuine issues of material fact as to his alleged exposure to H2S. FMT acknowledges that Plaintiff left his position after falling ill, but argues that Plaintiff has not set forth any evidence that this illness was caused by H2S exposure while on the vessel. FMT alleges there was no H2S released during the VGO loading process, nor did the VGO cargo contain dangerous levels of H2S. It

further alleges that sufficient monitoring of H2S was conducted at all relevant times, by tankermen, a Saybolt instructor, and Exxon. Finally, FMT argues there exists no medical evidence linking Plaintiff's illness and his symptoms to H2S exposure.

In response, Plaintiff argues that summary judgment is inappropriate because there exists evidence of H2S exposure. First, Plaintiff claims that FMT recognized that H2S exposure was a risk involved in loading the VGO. Second, Plaintiff claims Exxon ordered FMT to obtain personal protective equipment for H2S exposure prior to loading the VGO. With regard to monitoring, Plaintiff argues that the tankermen were not certified for H2S monitoring and other monitoring sources were useless or nonexistent. According to Plaintiff, his exposure to H2S occurred when H2S vapors fell to the vessel after being blown from vent stacks. Finally, Plaintiff argues that his H2S exposure is evidenced by his immediate and continuing medical symptoms and illness.

To address these arguments, the Court will now consider the evidence before it regarding the alleged H2S release, the H2S monitoring during and after loading of the VGO, and medical evidence of Plaintiff's H2S exposure.

On January 23-24, 2011, barges M401 and M403 were in the tow of the M/V BILL SEYMOUR and docked for loading of VGO at the Exxon Chalmette refinery. (R. Docs. 17-4, 20-5). VGO was loaded on the barges via an "open-hatch mode," meaning the vapors are freely released during loading through open hatches. *See* (R. Doc. 20-3). This is contrasted with a loading done under closed conditions where the fumes from the load are piped through a vent which carries the fumes up-and-away from the tankermen while they are working. (R. Docs. 20-3, 34-1). A "scavenger" system was used during the loading on the barges which uses chemicals

to "kill" the H2S vapours. (R. Doc. 34-1).

The VGO loading was initially held-up because of the absence of fresh air, which was ordered as a precaution as a matter of practice, but once it was available, loading began. *See* (R. Doc. 60-1). Requiring fresh air to be present is not indicative of cargo containing high levels of H2S. (R. Doc. 60-1). After loading, the vessel itself contained no H2S sources, only the barges. (R. Doc. 17-5).

John Starcher came on duty to the VGO loading as a bottle watch at 6:00 p.m., until midnight on January 23, 2011. (R. Doc. 17-4). He was conducting the bottle watch for two shore tankermen. (R. Doc. 20-3). As a bottle watch, Mr. Starcher monitored for H2S by wearing a H2S monitor on his upper torso area and was there to provide fresh air if necessary. (R. Docs. 17-4, 17-7, 20-5). Mr. Starcher has been trained in H2S detection and safety during his career, including by FMT. (R. Doc. 26-2). There is a procedure in place if someone detects H2S, which includes alerting everyone in the vicinity of the presence of the H2S, take appropriate actions, and to don fresh air. (R. Doc. 17-4). That evening, Mr. Starcher did not detect any H2S, nor did anyone else working notify him of any release. (R. Doc. 17-4).

Rodger Enzor was also on duty for the loading, but from around midnight on January 23, 2011, to 6:00 a.m. on January 24, 2011, relieving Mr. Starcher on bottle watch. (R. Docs. 17-5, 20-3). He also conducted the bottle watch for two shore tankermen. (R. Doc. 17-5, 20-3). Mr. Enzor was wearing an H2S detector while working. (R. Docs. 17-5, 20-3). Mr. Endzor is trained in H2S safety. (R. Docs. 20-3, 26-3). There was no H2S release detected during Mr. Enzor's duty. (R. Docs. 17-5, 20-3). According to Mr. Enzor, after everything was completely closed and disconnected for loading, which occurred around 4:30 a.m. on January 24, 2011, there

was no further risk of H2S exposure. (R. Doc. 17-5).

Roy Huval worked on the VGO loading operations on January 23-24, 2011, at the Exxon refinery. (R. Doc. 17-7). Mr. Huval worked as a shore tankerman. (R. Doc. 17-7). In this capacity, one of Mr. Huval's duties was to walk around the barge to check for H2S release. (R. Doc. 17-7). He has received H2S safety training. (R. Doc. 20-4). He also wore a H2S monitor while working that evening. (R. Docs. 17-4, 17-7). Mr. Huval did not detect a H2S release during his shift, nor did anyone else on his shift notify him of a release. (R. Doc. 17-7).

Tony Ghirardi, of the Saybolt company, conducted arrival and departure inspections of the VGO cargo at the Exxon refinery on January 23 and 24, 2011. (R. Doc. 17-11). He conducted the arrival inspections on the barges on January 23, 2011. (R. Docs. 17-11, 20-2). Mr. Ghirardi required the vessel to obtain an air set-up prior to loading; this was complied with prior to loading. *See* (R. Docs. 20-2, 20-8). Mr. Ghirardi arrived at the terminal on January 24, 2011, at 2:45 a.m. to conduct the departure inspection and was on board the vessel by 3:30 a.m. (R. Doc. 17-11). During these inspections, he took samples from every tank department in the barges. (R. Doc. 17-11). Based upon the test results from these samples, the VGO cargo in the barges did not pose a threat for releasing dangerous amounts of H2S. (R. Docs. 17-7, 17-10, 17-11). The Saybolt Analysis Report shows a reading of less than 1 ppm for liquid and less than 10 ppm for vapor H2S releases. (R. Docs. 17-13, 17-14, 20-2). Mr. Ghirardi wore an H2S monitor while conducting these inspections. (R. Doc. 17-11). This monitor did not go off while he was conducting either of his inspections. (R. Doc. 17-11).

Odley Banks, an AccuTrans tankerman, was also assigned to the loading on the vessel. (R. Docs. 17-4, 17-7, 34-1). He wore a H2S monitor and was responsible for detecting

H2S release.  (R. Docs. 17-4, 17-7).  The AccuTrans reports for January 23-24, 2011, indicate a 0 ppm reading for H2S.  (R. Doc. 17-8).

The Exxon refinery's Monitoring Log Sheets for the barges show a reading of zero H2S on January 23, 2011.  (R. Docs. 17-12, 20-2).  The refinery's representative, Steven Goulet, testified that the VGO in the tanks were in "sweet service," meaning that the VGO did not contain measurable quantities of H2S.  (R. Doc. 60-1).  No one was exposed to H2S during loading of the VGO on the barges.  (R. Doc. 60-1).

On January 23, 2011, Captain Charles German was on duty on the vessel when it arrived at the Exxon Chalmette Refinery.  *See* (R. Doc. 17-3).  Captain German stayed on watch until he was relieved by Plaintiff at approximately at 10:30 a.m. on January 23, 2011.  (R. Doc. 17-6).  Plaintiff never went on the barges which were holding the VGO.  (R. Doc. 17-6).  According to Plaintiff, after he finished this shift at around 1:00 a.m. on January 24, 2011, he smelled "VGO and the vinegary, musky smell and it made me nauseated."  (R. Doc. 20-13).  Then, Plaintiff started his fire watch and went down into the engine room around 4:00 a.m. where he "could smell the VGO, and it smelt like bad eggs."  (R. Doc. 20-13).  He turned on the exhaust fans and went outside for fresh air.  (R. Doc. 20-13).  He did not first become ill until the next day, and then he went back on watch at 11:30 a.m. on January 24, 2011.  (R. Doc. 17-6).  Around 5:30 p.m. on January 24, 2011, right after his duty ended, Plaintiff fell unconscious in his room.  (R. Doc. 17-6).  Plaintiff alleges he smelled the "burnt oil" smell of VGO in his room right before he collapsed.  (R. Doc. 17-6).  At this time, the vessel was 28 miles from the Exxon refinery.  (R. Doc. 17-6).  Plaintiff's symptoms included: ringing in his ears, deafness, nausea, loss of balance, and dizziness.  (R. Docs. 17-15, 17-16, 20-5, 20-8).  In response to Plaintiff's

illness, the vessel docked, Plaintiff's crew-members called an ambulance, and he was taken to the hospital.  (R. Docs. 17-15, 20-5).

No one else on the vessel was exposed to H2S during the relevant time period.  (R. Doc. 17-6).  No one else went in the engine room.  (R. Doc. 20-13).  There is no documentary evidence of a H2S release on the vessel on January 23-24, 2011.  (R. Doc. 17-6).  Captain German is unsure of how to detect the release of H2S on the vessel.  (R. Doc. 26-5).  Mr. Starcher was not aware of any H2S detection monitors on the vessel.  (R. Doc. 20-5).

FMT's Operations Manual provides that H2S tape monitors are to be on board each vessel, and employees must use H2S monitors when transferring cargos that may contain H2S.  (R. Doc. 20-6).  There is no evidence of the existence of this tape on the vessel.  The Manual further provides that the Permissible Exposure Limit, which is the "airborne concentrations of substance that it is believed that nearly all workers may be repeatedly exposed to day after day, without any adverse effect....is 10 ppm."  (R. Doc. 20-6).  There is no evidence of any H2S readings at or above 10 ppm.

On January 25, 2011, Plaintiff was examined by Dr. Robert Causey at the Our Lady of the Lake Regional Medical Center.  (R. Doc. 20-10).  Dr. Causey's discharge summary provides that Plaintiff was "presented with acute onset of right-side hearing loss, severe dizziness, severe imbalance, and severe nausea."  (R. Doc. 20-10).  He concluded that the nausea and vomiting were related to an "acute inner ear dysfunction."  (R. Doc. 20-10).  With regard to the sudden hearing loss and right-sided vestibular dysfunction, Dr. Causey noted "additional history was obtained indicating the patient is likely to have had hydrogen sulfide exposure before onset of symptoms.  However, no specific testing is available at this time for hydrogen sulfide

exposure, and the treatment is entirely supportive." (R. Doc. 20-10). Dr. Causey was later deposed and opined that Plaintiff's symptoms were more likely caused by viral labyrinthitis than exposure to H2S. (R. Doc. 60-2).

On March 15, 2011, Plaintiff saw Dr. William Katzenmeyer regarding "[p]ersistent tinnitus with hearing loss." (R. Doc. 20-11). The neurology consult report states under "HPI" that Plaintiff previously conducted a firewood journey loading of hydrogen sulfide on a barge in January 2011, and subsequently he felt very nauseated and dizzy, developed hearing loss and ringing in the right ear, sharp pains in the eye and back of the head, and he continues to suffer from vertigo and problems with his hearing and vision. (R. Doc. 20-11). Dr. Katzenmeyer's impression provides that Plaintiff's conditions arose "possibly during hydrogen sulfide," but that "vertigo and hearing loss would also suggest that there is an injury to his inner brain stem or inner ear." (R. Doc. 20-11).

On October 4, 2011, Dr. Shelley N. Savant, a psychiatrist and neurologist, examined Plaintiff and issued an expert report which states that Plaintiff reported his exposure to H2S while working on the vessel, as well as the symptoms reported to other physicians. (R. Doc. 38-7). One of Dr. Savant's impressions is that Plaintiff suffers from "status post hydrogen sulfide exposure (work-related)." (R. Doc. 38-7).

On March 1, 2012, Patricia Williams, Phd, DABT, issued an expert report on Plaintiff, opining that Plaintiff was exposed to H2S while on the vessel and this exposure was significant enough to cause the adverse health effects at issue. (R. Doc. 44-4).

Based upon the foregoing, the Court finds that the expert report of Dr. Williamson provides the sole basis to create genuine issues of material fact as to whether Plaintiff was

exposed to H2S.  No other expert opined that Plaintiff was exposed to H2S or his symptoms were indicative of H2S exposure, aside from noting the patient's own history.  Further, there exists no other evidence demonstrating Plaintiff was exposed to H2S; rather, the evidence shows that the H2S sources were monitored, no H2S was released during loading, the cargo did not release H2S in the barges, and no one else on the vessel was exposed to H2S.  Plaintiff fails to submit evidence as to how H2S became present in the vessel, only offering conjecture and speculation.

The Court acknowledges FMT's argument that Dr. Williamson's report is unreliable, but summary judgment is not a proper vehicle for the Court to make credibility determinations. *See Boudreaux v. Swift Transp. Co., Inc.,* 402 F.3d 536, 544 (5th Cir. 2005); *McPherson v. Rankin*, 736 F.2d 175, 180 (5th Cir. 1984).

**IV.    CONCLUSION**

For the foregoing reasons, IT IS ORDERED that FMT's Motion for Partial Summary Judgment (R. Doc. 17) is DENIED.

New Orleans, Louisiana this 24th day of April 2012.

                                                        U.S. District Judge